UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:                                          :
                                                :       Chapter 11
530 WEST 28TH STREET, L.P.,                     :       Case No. 08-13266 (SMB)
                                                :
                        Debtor.                 :
--------------------------------------------------------X

### MEMORANDUM DECISION AND ORDER
### REGARDING FINAL FEE APPLICATION BY
### WANDER & ASSOCIATES, P.C.

**A P P E A R A N C E S :**

WANDER & ASSOCIATES, P.C.
Attorneys for Official Committee of Unsecured Creditors
641 Lexington Avenue, 21st Floor
New York, New York 10022

        David H. Wander, Esq.
                Of Counsel


ALBANESE & ALBANESE, LLP
Successor Counsel to the Debtor
1050 Franklin Avenue
Garden City, New York 11530

        John H. Hall Jr., Esq.
                Of Counsel


DLA PIPER LLP (US)
Attorneys for JM Acquisition Company LLC
1251 Avenue of the Americas
New York, New York 10020-1104

        Thomas R. Califano, Esq.
        Vincent J. Roldan, Esq.
                Of Counsel

DIANA G. ADAMS
United States Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004

       Greg M. Zipes, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

Wander & Associates, P.C. ("Wander"), former counsel to the Official Committee

of Unsecured Creditors ("Committee"), filed its first and final application seeking fees in

the sum of $167,532.00 and reimbursement of expenses in the sum of $6,608.45 (the

"Wander Fee Application"). The debtor and United States Trustee filed partial objections

to the Wander Fee Application and a plan funder filed a more extensive objection. For

the reasons that follow, Wander is allowed fees in the sum of $145,319.75 and

reimbursement of expenses in the sum of $5,732.27. Finally, Wander's request to be

compensated for the services expended in defending the fee application is denied.

## BACKGROUND

The debtor is a New York limited partnership formed in 2002 for the purpose of

owning and operating two nightclubs – Pink Elephant and The Mansion.[1] (<u>Affidavit of

Bruce Dunston President of the General Partner of 530 West 28th Street, L.P. in Support

of Local Bankruptcy Rule 1007-2</u> ("<u>Rule 1007 Statement</u>"), dated August 21, 2008, at ¶

6) (ECF Doc. # 2.) Both nightclubs are located at 530 West 28th Street in Manhattan (the

---

[1]      At the time of its formation, the President of the General Partner was Kenneth R. Barilich
("Barilich"). The Limited Partners were: (1) Intertain Corp., Kenneth Marinelli, President; (2) Callin
Fortis; (3) Barilich; (4) Dunston Enterprises Inc. LLC, Bruce Dunston, President; and (5) PJZ
Entertainment LLC, Peter Zahakos, President. (<u>Rule 1007 Statement</u>, at ¶ 13.)

"Premises") in space rented from RN Realty, LLC ("RN Realty") pursuant to a 20-year

lease (the "Lease").  (Id. at ¶¶ 6–7.)  Prior to the commencement of this case, they were

operated by non-debtor entities pursuant to management agreements.  Paradigm

Management Group operated the Pink Elephant and Mansion 530, LLC ("Mansion 530")

managed Mansion.  (Id. at ¶¶ 9–10.)

The debtor filed its chapter 11 petition in this Court on August 21, 2008, and

listed Bond & Walsh Construction Co. ("Bond & Walsh") as its largest creditor.

According to the debtor, Bond & Walsh held a secured claim in the amount of

$4,023,819.16, and a deficiency claim in the amount of $1,752,565.45 (collectively the

"Bond & Walsh Claim").  The claims arose from construction work done at the Premises

by Bond & Walsh.  (Voluntary Chapter 11 Petition, dated August 21, 2008, at Sched. D)

(ECF Doc. # 1.)  Other significant claims scheduled by the debtor included $630,797.50

owed to RN Realty, (id., at Sched. F), and New York State tax claims totaling

$232,965.23.[2]  (Id., at Sched. E.)

On the first day of the case, the debtor requested permission to utilize Bond &

Walsh's cash collateral, (ECF Doc. # 9), but the bona fides of the Bond & Walsh Claim

was open to question.  In addition to gaps in the documentation, RN Realty asserted that

Bond & Walsh had funded the construction work with money obtained from Edgewater

Development, an entity owned by Thomas Kontogiannis a/k/a Tommy K.  Kontogiannis

was currently serving a prison sentence for bribing a United States Congressman.  (RN

---

[2]        The New York State Attorney General eventually filed a proof of claim in the sum of $297,217.63
relating to alleged violations of New York State labor laws.  (See Third Amended Disclosure Statement for
Plan of Reorganization of 530 West 28th St., LP, dated Apr. 22, 2009, at 22) (ECF Doc. # 244.)

Realty's Limited Objection to the Motion of Debtor Seeking Authorization to Use Cash

Collateral, dated September 2, 2008, at ¶ 4) (ECF Doc. # 18.)

Questions regarding the validity of the Bond & Walsh Claim, and the connections

among Bond & Walsh, Kontogiannis and the debtor became a serious source of

contention between the debtor on the one hand, and the Committee and its counsel, David

Wander, Esq., on the other.[3]  The Committee and Wander insisted that the Bond & Walsh

Claim should be recharacterized as equity, and asserted that "the debtor has been

controlled by a person known as Tommy K."  (12/22/08 Tr. 23-24.) [4]

The contentious relationship infected every significant issue in the case, and

transformed virtually every disagreement into a dispute that required litigation.  For

example, on December 4, 2008, the debtor moved pursuant to Section 1121(d) of the

Bankruptcy Code ("Code") to extend its exclusive period for filing a plan of

reorganization through March 31, 2009 ("Exclusivity Motion").  (ECF Doc. # 86.)  The

Committee objected on numerous grounds asserting that the debtor (1) had not made any

good-faith effort to negotiate a plan with the Committee, (2) had not explained how the

debtor intended to fund a plan, and (3) had not included the Committee in discussions

regarding the Lease.  (Objection by Creditors Committee to Debtor's Motion Seeking to

Extend the Exclusive Periods Pursuant to § 1121(d) of the Bankruptcy Code, dated Dec.

---

[3]     On September 12, 2008, the United States Trustee appointed the Committee, consisting of
Mansion 530, Sound Investment, Ltd., and FDD, Inc.  (ECF Doc. # 28).  The Court approved the retention
of the Wander firm as counsel to the Committee by order dated Oct. 22, 2009.  (ECF Doc. # 63.)

[4]     The daily transcripts in this case are cited by date and page.  For example, "12/22/08 Tr. 23" refers
to page 23 of the December 22, 2008 transcript.

11, 2008, ¶ 3) (ECF Doc. # 94.)  Additionally, the Committee asserted that there were "issues relating to the alleged secured claim of Bond & Walsh."  (Id. at ¶ 5.)

On December 16, 2008, the Court held a hearing on both the Exclusivity Motion and a motion to extend the time to assume or reject the Lease.  The debtor informed the Court at the hearing that a third-party, JM Acquisition Corp., LLC ("JM"), had purchased the Bond & Walsh Claim and had provided the debtor with a term sheet for a plan of reorganization.  JM proposed to (a) escrow $631,000 on the effective date of the plan to deal with any deficiencies under the Lease; (b) put up security of $175,000 to settle the Attorney General Action; and (c) convert the Bond & Walsh Claim into equity.  (12/16/09 Tr., 5, 6–7) (ECF Doc. # 117.)  The Court scheduled an evidentiary hearing on the Exclusivity Motion for December 22, 2008.

JM fleshed out its proposal two days later.  (See Statement of JM Acquisition Company LLC in Support of Debtor's Motion for an Order Pursuant to Section 1121(d) of the Bankruptcy Code Extending the Exclusive Periods for the Filing of a Chapter 11 Plan and the Right to Solicit Acceptances Thereto, dated Dec. 18, 2008 ("JM Term Sheet"), at Ex. A) (ECF Doc. # 106.)  JM planned to provide exit financing equal to the administrative expenses, the amount needed to make a 5% distribution to the unsecured creditors (capped at $200,000), and the approximate $631,000 to cure the defaults under the Lease.  In addition, JM confirmed that the Bond & Walsh Claim would be converted to 100% equity in the reorganized debtor.  Ironically, this granted the Committee all of the relief it could have obtained through a successful recharacterization fight.

One day later, on December 19, 2008, Wander nevertheless filed an affirmation[5]

requesting an adjournment of the December 22, 2008 evidentiary hearing, and authority

for the Committee to commence an adversary proceeding against Bond & Walsh or the

assignee of the Bond & Walsh Claim to recharacterize and/or equitably subordinate the

claim.  Asserting that "[t]he secretive nature of the Term Sheet and other matters clearly

warrant further investigation," (Wander Affirmation, at ¶ 8), Wander made the following

charges:

> (i) Bond & Walsh is an equity owner and not a real creditor; (ii) at least two of the
> three limited partners of the Debtor have had an undisclosed side deal with Bond
> & Walsh; (iii) Bond & Walsh has controlled the Debtor both directly, through the
> daughter of Bond & Walsh's principal, and indirectly through the Debtor's
> limited partners; and (iv) the President of Bond & Walsh, Elias Aspergis, has
> been a figurehead while the company has been controlled by his father-in-law,
> Tommy Kontogiannis a/k/a "Tommy K ("Tommy K"), the owner of Bond &
> Walsh who is now in prison for bribing a U.S. Congressman.

(Id. at ¶ 12.)

The Court denied the request for an adjournment, and conducted the hearing on

the Exclusivity Motion on December 22, 2008.  Bruce Dunston, Joseph Morrissey (the

sole equity owner of JM) and Bruce Alter, Esq., the attorney for RN Realty, testified.

The substance of the testimony revolved around the JM proposal, and the opposition took

two approaches:  the Committee continued to hammer on the connection between Bond

---

[5]    The full title of the Wander Affirmation is Affirmation by David Wander, Esq. on Behalf of
Creditors Committee (i) Requesting Adjournment of Evidentiary Hearing on Debtor's Motion for
Extension of Exclusive Periods to Jan. 6, 2009 and Directing Discovery of Debtor's Limited Partners, Bond
& Walsh Inc. and Proposed Plan Funder and (ii) Requesting Authority for Committee to Commence
Adversary Proceeding against Bond & Walsh Inc. or the Assignee of its Alleged Secured Claim (a) to
Recharacterize the Claim from Debt to Equity and/or (b) to Equitably Subordinate the Claim, dated Dec.
19, 2008) (ECF Doc. # 103.)

& Walsh, Kontogiannis and the debtor, and speculated that a superior plan could be
negotiated and confirmed, presumably with the backing of a third party.

At the close of the evidence, the Court granted the Exclusivity Motion but only
until January 31, 2009; JM was prepared to put $4 million into the case, the debtor and
JM appeared to be negotiating in good faith towards a plan and the debtor had
demonstrated reasonable prospects for confirming a plan.  Furthermore, the Committee
had to resolve numerous contingencies under its possible rival plan, including the
successful resolution of recharacterization litigation and other issues that would take a
long time.  If, however, the Committee came forward with a viable plan, it could move to
terminate exclusivity.  (12/22/09 Tr. 99–101) (ECF Doc. # 118.)

Following the ruling, Wander raised the question of the Committee's derivative
standing to challenge the Bond & Walsh Claim if the Committee moved forward with its
own plan.  (Id. at 104.)  I advised Wander that he would have to make a motion for
authority to litigate the challenge, see In re STN Enterprises, 779 F.2d 901 (2d Cir. 1985),
but warned:

> [I]f all you're going to get at the end of the day is the same relief that
> you're going to get under this plan, and your proposed plan isn't any better
> than this plan, there's no purpose to challenging it.

(12/22/09 Tr. 104–05.)  Wander assured me that he "would never do it, Your Honor, as a
meaningless exercise."  (Id. at 105.)

The battleground soon shifted to a new front when the debtor moved to reject the
executory contract with Mansion 530, a member of the Committee, based on numerous
disputes with Mansion's management services.  (Motion of Debtor Seeking

Authorization to Reject Executory Contract with Mansion 530 LLC, dated Dec. 24, 2008 ("Mansion Rejection Motion")) (ECF Doc. # 113.)  The motion was returnable on January 8, 2009.

The Committee objected.  (See Objection by Creditors Committee to Debtor's Motion Seeking Authorization to Reject Executory Contract with Mansion 530 LLC., dated Jan. 6, 2009) (ECF Doc. # 123.)  It argued that The Mansion was more profitable than the Pink Elephant, (id. at ¶ 16), the criticism of Mansion 530's management was baseless or irrelevant and its value was underestimated, (id. at ¶¶ 20–24), and the rejection did not benefit the unsecured creditors.  (Id. at ¶¶ 27–28.)  The Committee also charged that the rejection motion was retaliation intended to punish Mansion 530 for its efforts to investigate the debtor's relationship with Bond & Walsh and the validity of the Bond & Walsh Claim and to undercut a competing plan by the Committee based on funding provided by Mansion 530.  (Id. at ¶ 4.)  Mansion 530 objected essentially on the same grounds.  (Opposition of Mansion 530, LLC to Debtor's Motion to Reject Executory Contract, dated Jan. 6, 2009) (ECF Doc. # 124.)

On December 31, 2008, and prior to the hearing on the Mansion Rejection Motion, the Committee filed a motion for an order pursuant to Federal Bankruptcy Rule 2004.  (Motion by Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Rule 2004, for Order Directing Examinations of (I) Debtor, (II) Bruce Dunston, (III) Peter Zahacos, (IV) Kenneth Marinelli, (V) Elias Apergis; (VI ) Annette Apergis; (VII) LCK Services, Inc., (VIII) Richard Gluszak; (IX) Robert Meyers; (X) Thomas Karas; (XI) Heidi Marie Brandt; (XII) Capital One Bank; (XIII) Joseph Morrisey; AND (XIV) David Sarner, dated Dec. 31, 2008 ("Rule 2004 Motion")) (ECF Doc. # 120.)  The

8

Committee sought information from the long list of examinees identified in the title of the pleading regarding, inter alia, the debtor's pre-petition and post-petition business operations, the relationship between the debtor and Bond & Walsh and the validity of the Bond & Walsh Claim, the alleged priority of the New York State Attorney General's claim, allegedly improper transfers and various other matters relating to the case. Mansion 530 joined the request, (Joinder of Mansion 530, LLC to the Motion of the Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Rule 2004, for an Order Directing Examinations of (I) the Debtor; (II) Bruce Dunston; Peter Zahakos; (IV) Kenneth Marinelli; (V) Elias Apergis; (VI) Annette Apergis; (VII) LCK Services, Inc.; (VIII) Richard Gluszak; (IX) Robert Meyers; (X) Thomas Karas; (XI) Heidi Marie Brandt; (XII) Capital One Bank; (XIII) Joseph Morrissey; and (XIV) David Sarner, dated Jan. 6, 2009) (ECF Doc. # 125), and JM opposed it.  (JM Acquisition Company LLC's Objection to the Motion of the Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Rule 2004, for an Order Directing Examinations of (I) the Debtor; (II) Bruce Dunston; Peter Zahakos; (IV) Kenneth Marinelli; (V) Elias Apergis; (VI) Annette Apergis; (VII) LCK Services, Inc.; (VIII) Richard Gluszak; (IX) Robert Meyers; (X) Thomas Karas; (XI) Heidi Marie Brandt; (XII) Capital One Bank; (XIII) Joseph Morrissey; and (XIV) David Sarner, dated Jan. 7, 2009) ("JM 2004 Objection")) (ECF Doc. # 140.)

JM's objection captured its concern over the unnecessary burgeoning of administrative expenses – expenses it had committed to fund:

> In this case, JM Acquisition objects to the 2004 Motion because it inappropriately seeks information from third parties who have absolutely no relevant information or documents concerning the Debtor, its business, or this case and because it is likely not the efficient way to gather

information. The Committee will only compound the already significant
administrative expenses by seeking to depose the woman who provided
bathroom attendant services from the years of 2004 and 2005, a former
employee who worked for the Debtor more than three (3) years ago,
another individual who may have worked for the Debtor more than four
(4) years ago and who now lives in Florida, or the accountant responsible
for the Debtor's 2006 tax returns.  These persons simply do not have any
information relevant to the Debtor's estate. . . .

(JM 2004 Objection, at ¶ 25.)[6]  JM insisted that the Committee could get pertinent

information from fewer people more economically than the proposal, (id. at ¶ 33), and

JM had offered to provide relevant documents and information to Wander, but Wander

rebuffed the offer.  (Id. at ¶¶ 16–18.)[7]

On January 8, 2009, the Court conducted hearings, inter alia, on the Mansion

Rejection Motion and the Rule 2004 Motion.  After lengthy colloquy, the Court

determined that the former raised factual issues requiring an evidentiary hearing, and set

the matter down for a trial on January 28, 2009.  (1/8/09 Tr. 43)(ECF Doc. # 148.)  When

the Court turned to the Rule 2004 Motion, JM repeated its concerns about the

administrative costs that would be incurred under a plan it was funding.  (Id. at 53–55.)

Wander then amplified the areas into which he wanted to inquire.  (Id. at 57–59.)  The

Court concluded that the areas of inquiry were appropriate, and the Committee could

serve its subpoenas.  (Id. at 59.)  However, the Court admonished Wander that his

compensation for the proposed examinations would be determined at the time of the final

fee application based on the reasonableness and necessity of what he did.  (Id. at 62.)

---

[6]    JM particularized these objections in the ensuing paragraphs.  (See JM 2004 Objection, at ¶¶ 26–31.)

[7]    JM had sent Wander a proposed confidentiality agreement under which Wander could not share
any information with his client, the Committee.  (See JM 2004 Objection, at Ex. A.)  Wander protested, and
JM replied that the Committee members would have to sign the confidentiality agreement in order to
receive anything.  (Id. at Ex. B.)

Mansion 530 independently moved to appoint a chapter 11 trustee.  (Motion of Mansion 530, LLC for an Order, Pursuant to 11 U.S.C. Sections 105(a), 363 and 1104, (i) Appointing a Chapter 11 trustee; (ii) Alternatively, Compelling the Debtor to Schedule an Auction Sale for its Lease for Non-Residential Real Property; and (iii) Granting Related Relief, dated Jan. 20, 2009, ("Trustee Motion")) (ECF Doc. # 155.)  Mansion 530 argued that the debtor and its counsel had not acted with independence in connection with Bond & Walsh and its successor JM.  In particular, the debtor was prepared to concede the validity of the Bond & Walsh lien in the Lease, but had ignored or failed to investigate obvious defects with the claimed interest.  (Id. at ¶ 2.)  In addition, the debtor had ignored Mansion 530's offer to purchase the Lease for $2 million, subject to higher and better offers.  (Id. at ¶ 3.)  On January 26, 2009, the Committee filed a statement of joinder to the Trustee Motion,[8] (Joinder by the Official Committee of Unsecured Creditors to the Motion by Mansion, 530, LLLC for the Appointment of a Chapter 11 Trustee, dated Jan. 26, 2009) (ECF Doc. # 165), and that same day the debtor filed opposition papers, (Opposition to Motion of Mansion 530, LLC, Seeking an Order Appointing a Chapter 11 Trustee, or in the Alternative, Scheduling an Auction Sale of the Lease, dated Jan. 26, 2009) (ECF Doc. # 167), as did JM.  (JM Acquisition I LLC's Objection to the Motion of Mansion 530, LLC for an Order, Pursuant to 11 U.S.C. Sections 105(a), 363 and 1104, (I) Appointing a Chapter 11 trustee; (II) Alternatively, Compelling the Debtor to Schedule an Auction Sale for its Lease for Non-Residential Real Property; and (III) Granting Related Relief, dated Jan. 26, 2009) (ECF Doc. # 169.)

---

[8]        Wander's time records indicate that the Committee was also contemplating a trustee motion, but Mansion 530 apparently filed its own before the Committee could.  The Committee never filed its own motion, and instead, joined in Mansion 530's.

That same day, Mansion 530 informed the Court by letter that it was no longer

interested in purchasing the Lease, and wished to withdraw the Trustee Motion.  (ECF

Doc. # 164.)  At a conference the following day, Wander and the United States Trustee

expressed their desire to continue to prosecute the Trustee Motion, and the Court

scheduled a final hearing on the Trustee Motion for February 20, 2009.

On January 29, 2009, JM filed a proposed plan of reorganization, (ECF Doc. #

173), and disclosure statement.  (ECF Doc. # 174.)  JM subsequently filed three amended

plans.  (ECF Doc #s 208, 220 and 226.)  In addition to the terms in the JM Term Sheet,

the final version of the plan contemplated a 16% distribution to holders of Class 4 claims

(general unsecured claims).  (Plan of Reorganization of 530 West 28th Street, LP, dated

Mar. 30, 2009 ("Plan"), at 14) (ECF Doc. # 226.)

On February 13, 2009, prior to the Trustee Motion evidentiary hearing, Wander

moved to withdraw as counsel for the Committee because he was no longer able to

effectively communicate with members of the Committee.  (Motion by Wander &

Associates, P.C. to Withdraw as Attorney of Record for the Creditors Committee

Pursuant to Local Bankruptcy Rule 2090-1(e), dated Feb. 13, 2009) (ECF Doc. #180.)

The Court approved Wander's request to withdraw by order dated March 2, 2009, and

adjourned the Trustee Motion evidentiary hearing sine die.  (ECF Doc. #191.)

Wander filed the Wander Fee Application on April 1, 2009.  (Application for

Final Compensation and Reimbursement of Expenses by Former Attorneys for Official

Committee of Unsecured Creditors, Pursuant to § 330 of the Bankruptcy Code,

Bankruptcy Rule 2016(a), and Local Bankruptcy Rule 2016-1, dated Apr. 1, 2009.) (ECF

Doc. # 223.)  JM objected to it on numerous grounds.[9]  (JM Acquisition I LLC's

Objection to the Application for Final Compensation and Reimbursement of Expenses by

Former Attorneys for Official Committee of Unsecured Creditors, Pursuant to § 330 of

the Bankruptcy Code, Bankruptcy Rule 2016(a),and Local Bankruptcy Rule 2016-1,

dated Apr. 24, 2009) (ECF Doc. # 247.)  First, the fee request was disproportionately

large compared to the size of estate.  (Id. at ¶ 22.)  Second, certain categories of legal

services did not benefit the estate.  These included the Rule 2004 Motion, (id. ¶¶ 24-27),

the objection to the Mansion Rejection Motion, (id. at ¶¶ 28-33), support for the Trustee

Motion, (id. at ¶¶ 34-36), the motion to withdraw as counsel, (id. at ¶ 37), and the

objection to the Exclusivity Motion.  (Id. at ¶¶ 38-40.)  Third, JM challenged the

sufficiency of certain time records, itemizing a substantial number that JM viewed as

"lumped," vague, and duplicative.  (Id. at ¶¶ 41-46.)  The Court heard the Wander Fee

Application on April 28, 2009, approved interim compensation in the amount of $50,000,

(Order Granting Interim Payment on Application for Final Compensation by Wander &

Associates, P.C., Former Attorneys for Creditors Committee, May 20, 2009) (ECF Doc. #

267), and adjourned final consideration of the Wander Fee Application until the hearing

on plan confirmation.

After the hearing, Wander filed a response to JM's objection.  (Affirmation by

David Wander, Esq. in Response to Objection by JM Acquisition I LLC to Final

Application for Compensation by Wander & Associates, P.C., Former Attorneys for

---

[9]     The United States Trustee also objected on the ground that the application was premature and should await confirmation of the Plan.  (Objection of the United States Trustee to Application for Final Allowance of Fees and Reimbursement of Out of Pocket Expenses Pursuant to 11 U.S.C. § 330, dated Apr. 1, 2009) (ECF Doc. # 246.)  The Plan was subsequently confirmed, mooting the objection.

<u>Official Committee of Unsecured Creditors</u>, dated May 8, 2009, ("<u>Wander Response Affirmation</u>") (ECF Doc. # 256.)  He devoted most of the response to a justification of his pursuit of the information regarding the connections among the debtor, Bond & Walsh and Kontogiannis.  He also clarified many of the time entries that JM challenged, (<u>see</u> <u>id.</u> at ¶¶ 34–38; Ex. 25) (ECF Doc. # 263), and offered to reduce his request by 10%.  (<u>Wander Response Affirmation</u>, at ¶ 39.)  He also filed a supplemental response in which he requested, among other things, compensation for the time spent defending his fee application.[10]

The Court conducted the confirmation hearing on May 27, 2009.  JM's attorney proffered Morrissey's testimony to the effect that JM had no connection with the Kontogiannis family or its affiliates except for the purchase of the Bond & Walsh Claim for $1.25 million following arms-length negotiations.  (5/27/09 Tr., 25) (ECF Doc. # 279.)  JM and Morrissey had submitted voluntarily to an examination under oath by the UST, and satisfied her that there was no connection.  (<u>Id.</u>)  In addition, no member of former equity would have any interest in or connection to the reorganized debtor.  (<u>Id.</u> at 25–26.)  The Court asked whether anyone objected to the proffer or wished to cross-examine Morrissey, and received no response.  (<u>Id.</u> at 27.)  The United States Trustee confirmed that she had conducted her own investigation, and while "there was a lot of smoke in this case that needed to be investigated," she was unable to find evidence

---

[10]    That submission also addressed certain "good faith" concerns that Wander had with regard to the Plan.  (<u>Supplemental Affirmation by David Wander, Esq. (I) in Support of Final Application for Compensation by Wander & Associates, P.C., Former Attorneys for Official Committee of Unsecured Creditors and in Response to Objection by JM Acquisition I LLC ("JMA"); (II) Objecting to Discovery Demands of JMA, and (II) Regarding Statement in Response to Debtor's Third Amended Plan of Reorganization</u>, dated May 22, 2009, ("<u>Wander Supplement</u>")) (ECF Doc. # 271.)

substantiating a connection between Kontogiannis and JM or the reorganized debtor. (See id. at 44.)

Wander would have none of it.  Although he did not file an objection or choose to cross-examine Morrissey, he continued to espouse his personal view that that the Plan was proposed in bad faith.  He contended that the debtor's former equity was a front for Kontogiannis and that the Bond & Walsh Claim was not a real claim.  (Id. at 36–37.) However, despite the unrefuted offer of proof of good faith negotiations and the elimination of former equity, Wander appeared to imply that Morrissey and Dunston, acquaintances of many years, had negotiated a collusive plan to perpetuate Kontogiannis's control.  (See id. at 37–42.)

The Court was compelled to remind Wander, more than once, that the confirmation hearing was an evidentiary hearing, and there was no evidence to support his supposition.  (Id. at 36, 41.)  In response, Wander insisted that the plan proponent had the burden to prove that the debtor did not have any connection with Kontogiannis, (id. at 41–42), until he was reminded that in the absence of a timely objection, Rule 3020(b)(2) of the Federal Rules of Bankruptcy Procedure allowed the Court to "determine that the plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues."  (Id. at 42.)

At the conclusion, the Court confirmed the Plan and reserved decision on the Wander Fee Application.

## DISCUSSION

Bankruptcy Code § 330 authorizes a bankruptcy court to award reasonable compensation to a fee applicant based on the actual, necessary services, and to reimburse him for his actual, necessary expenses.  11 U.S.C. § 330(a)(1).  Section 330(a)(3)(A) establishes the relevant criteria:

> In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including —
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
>
> (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.[11]

The fee applicant bears the burden of proof on his claim for compensation. Howard & Zukin Capital v. High River Ltd. P'ship, No. 05 Civ. 5726 (BSJ), 2007 WL 1217268, at *2 (S.D.N.Y. Apr. 24, 2007); Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.), 210 B.R. 19, 24 (B.A.P. 2d Cir. 1997); In re Keene Corp., 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997).  Even in the absence of an objection, the Court has an independent duty to scrutinize the fee request.  In re Busy Beaver Bldg. Ctrs., Inc.,

---

[11]    The criteria are also stated in the negative.  The Code expressly proscribes compensation for services that are unnecessarily duplicative, not reasonably likely to benefit the estate or unnecessary for the administration of the case.  11 U.S.C. § 330(a)(4)(A).

16

19 F.3d 833, 841 (3d Cir. 1994). The applicant must submit contemporaneous time records, although a computerized printout summary, in lieu of the original time slips, will suffice. Masterwear Corp. v. Angel & Frankel, P.C. (In re Masterwear Corp.), 233 B.R. 266, 278 & n. 14 (Bankr. S.D.N.Y. 1999). The standards for time records are contained in this Court's Fee Guidelines, as amended, and the guidelines issued by the Executive Office of United States Trustees. See 28 C.F.R., pt. 58, App. A (2007) ("UST Guidelines").[12]

Generally, fee applications, standing alone, must contain sufficient detail to demonstrate compliance with § 330. UST Guidelines, (b). Any uncertainties due to poor record keeping are resolved against the applicant. In re Poseidon Pools of America, 216 B.R. 98, 100-101 (E.D.N.Y. 1997). Time records must be broken down by project. UST Guidelines, (b)(4)(i). Entries concerning communications (e.g., telephone calls, letters) should identify the parties and the nature of the communication. Id., (b)(4)(v). Entries relating to conferences or hearings should identify the subject of the hearing, and explain, where appropriate, why more than one professional from the applicant participated. Id. Finally, multiple project services rendered on the same day should be listed in separate entries unless the aggregate daily time does not exceed one half hour. Id. Alternatively, and consistent with the practice followed here prior to the adoption of the UST Guidelines, the applicant may "lump" his daily project entries provided he indicates parenthetically the amount of time spent on each activity.

---

[12]     The Court's Administrative Order M-151 (re: Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases), dated Apr. 19, 1995, at ¶ A, implicitly adopted the UST Guidelines for all fee applications filed on or after May 1, 1995 in post–1994 Reform Act cases.

It must be borne in mind that a Court does not determine "reasonableness" through hindsight.  In re Brous, 370 B.R. 563, 570 (Bankr. S.D.N.Y. 2007).  A decision reasonable at first may turn out wrong in the end.  The test is an objective one, and considers "what services a reasonable lawyer or legal firm would have performed in the same circumstances."  In re Ames Dep't Stores, Inc., 76 F.3d 66, 72 (2d Cir.1996) (citing In re Taxman Clothing Co., 49 F.3d 310, 315 (7th Cir.1995) (Posner, C.J.)); accord In re Angelika Films 57th, Inc., 227 B.R. 29, 42 (Bankr. S.D.N.Y.1998); In re Keene Corp., 205 B.R. at 696; In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 23 (Bankr. S.D.N.Y. 1991).

JM's argument of disproportionate services, standing alone, lacks merit.  The objection implies a formula or range against which the Court must measure the fee, and suggests that the Court should deny fees that exceed the range regardless of the reasonableness and necessity of the services.  While the size of the estate informs the reasonableness and necessity of counsel's services, the Court must consider those services in determining whether the fee applicant should be compensated.

JM's second objection, which focuses on specific areas and services, has merit. The Bond & Walsh Claim drove this case.  In Wander's view, his constituency would receive a larger distribution if the Committee could successfully recharacterize the Bond & Walsh Claim from secured debt to equity.  No other plan was acceptable, and he rejected the term sheet tendered by Mansion 530 that did not include the requirement of recharacterization.  (Wander Supplement, at ¶ 8.)  Yet any challenge to the Bond & Walsh Claim would be costly and time-consuming, and as even Wander recognized, the

18

estate faced a March 21, 2009 deadline to assume or reject its the Lease.[13]  The likelihood

of resolving the recharacterization issue by then was nil, and if the debtor assumed the

Lease, it would have to pay RN over $600,000 in cure costs.

The principal obstacles – recharacterization and plan funding – were solved with

the arrival of JM.  It agreed to recharacterize the Bond & Walsh Claim, which it had

acquired, from secured debt to equity.  This was all the relief that Wander and the

Committee sought.  JM also agreed to provide the substantial financing necessary to fund

the plan, including a distribution to unsecured creditors.

Obsessed with the debtor's possible connection with Bond & Walsh and

Kontogiannis, coupled with a deep-seated suspicion of JM, Wander continued to

investigate the recharacterization claim and oppose the Exclusivity Motion and the JM

plan.  He had no better plan to propose, and he was unlikely to come up with one given

the Bond & Walsh's putative secured claim, the cost, delay and ultimate uncertainty of

recharacterization litigation, the impending deadline to assume the Lease and the

substantial funding needed to confirm a plan that would pay anything to the unsecured

creditors.

Under the circumstances, Wander's continued opposition to the JM plan and his

stepped up efforts to build a case for recharacterization utilizing the Rule 2004 process

were unreasonable and unnecessary, and did his constituency a disservice.  Moreover, he

rebuffed JM's offer to provide the information more expeditiously and cheaply,

---

[13]        By stipulation and order dated March 10, 2009, the deadline to assume or reject was extended
until April 21, 2009.  It was thereafter extended by oral agreement, and upon confirmation, the debtor
assumed the Lease.

apparently because JM insisted that he and the Committee members sign a confidentiality stipulation.  See footnote 7, supra.  As a consequence, he is not entitled to compensation for these services.

Schedule A identifies the services relating to the preparation and prosecution of the Rule 2004 motion, and the conduct of the examinations.  The time charges aggregate $15,709.50.  Certain entries are also vague for the reasons discussed later in this opinion, and those entries are shown in bold face.  Finally, in several instances, multiple entries on the same day are improperly lumped.  These entries are italicized.  Excepting the first entry, dated October 14, 2008, the time charges aggregating $15,369.50 are disallowed.

**Lumping – Schedule B**

"Lumping" refers to the practice of aggregating time entries involving two or more discrete tasks without identifying the time spent on each task.  Lumping makes it difficult to determine if the timekeeper spent a reasonable amount of time on each discrete task.  As a result, the timekeeper fails to sustain its burden of proving that its fees are reasonable.  The UST Guidelines permit lumping only where the aggregate time does not exceed 30 minutes.  UST Guidelines, (b)(4)(v).

JM's opposition to the Wander Fee Application identified 19 instances of lumping.  Wander's response to the JM objection included handwritten notations that Wander made on Exhibit 25 in and effort to "de-lump" these entries.   (See ECF Doc. # 263.)  Where Wander interlineated the time spent on a discrete task, the Court accepted it.  However, the Court rejects Wander's handwritten comments to the effect that multiple discrete activities were part of continuous or overlapping services and should be allowed

without regard to lumping; it is simple enough to list the amount of time spent on each discrete task.

Schedule B includes six of the original 19 entries that still suffer from lumping. The italicized typeface that appears in the 1/8/09 entry indicates the part of the larger entry that is lumped. Finally, vague entries are shown in bold faced print. The Court will allow 0.5 hours for each lumped entry, the amount of time that may be billed in a single day without running afoul of the lumping rules. In the case of the 1/8/09 entry, the Court will also allow the aggregate 0.3 hours of time that is not printed in italics and is not lumped. The foregoing results in the allowance of $1,460 on Schedule B, and the disallowance of $3,622.50.

### Vague Entries – Schedule C

Schedule C lists nine entries aggregating $5,558.00 in billed time. These entries are vague in whole or in part, and the vague portions are printed in boldface. Like the vague entries discussed above, they generally refer to research projects so inadequately described that the Court cannot determine what the timekeeper actually did or whether the timekeeper spent a reasonable amount of time doing it. In addition, four of the entries refer to "strategizing," a description that fails to impart the precise service the timekeeper has performed.

The vaguely described activities are allowed at 50% of the amount of time billed. Where a discernible portion of a larger entry is vague, the deduction only applies to that portion, and the balance of the time is allowed (e.g., entries dated 10/15/08, 10/20/08).

As set forth on Schedule C, $3,210.00 is allowed, and the balance of $2,347.75 is disallowed.

**Telephone & Correspondence – Schedule D**

Schedule D lists nine entries aggregating two hours and $872.50 in billed time. The time entries suffer from a common flaw. The services concern telephone calls or emails between Wander and one or more third parties. The entries do not identify the subject matter of the call or email, and they are disallowed in their entirety.

In conclusion, the Court will allow $145,319.75 and disallow $22,212.25 of the total compensation sought in the Wander Fee Application. The disallowed fees represent 13.26% of the total request, and the Court will disallow the same percentage of expenses sought, see Keene, 205 B.R. at 706, and allow $5,732.27. Finally, the Court will not award Wander any portion of the fees incurred in defending his fee application. The JM objections were made in good faith, the Court sustained many of the objections, and there is no reason to deviate from the American Rule under which litigants must bear their own legal expenses. See Brous, 370 B.R. at 572.

The Court has considered the parties remaining arguments, and concludes that they lack merit. Settle order on notice.

Dated: New York, New York
         December 11, 2009

                                      /s/ *Stuart M. Bernstein*
                                      STUART M. BERNSTEIN
                                   Chief United States Bankruptcy Judge